## Shubart's Estate.    Walborn's Appeal.

*Will—Legacy charged on land for support of child.*

Testator charged on land devised to a son twenty-five hundred dollars, the interest on which at six per cent was to be used for the " boarding, washing, mending and clothing" of an invalid daughter of testator. It was further provided that "after the death" of the daughter "after all expenses and the funeral expenses be paid, the remainder of the twenty-five hundred dollars shall be equally divided" among testator's other children. The daughter was an idiot without power of speech, and three years and a half before her death she was stricken with paralysis, becoming totally helpless and blind. During a period of some six years she lived with her brother, who cared for her, and at her death buried her. During the whole period that she lived with him he received one hundred and fifty dollars a year from the owner of the land charged with the legacy. *Held*, that the brother was entitled to receive, out of the principal of the legacy, three dollars a week for one hundred and eighty-two weeks nursing and personal attendance on his sister, and also the sums which he had expended for her burial and medical attendance.

*Services—Change of condition—Receipt—Estoppel.*

The receipt of the interest on the legacy will not estop the claimant from recovering a quantum meruit for the duties and labors which were imposed by the changed condition and not contemplated by the claimant when he took his sister to care for her.

*Family relationship—Presumption.*

Where the parties are brother and sister and the brother claims compensation for the services, the burden of showing family relationship or other cause to exclude the implication of a promise to pay for services is on the sister or her trustee.

Argued March 1, 1893. Appeal, No. 160, Jan. T., 1893, by Susanna Walborn, legatee under the will of Henry Shubart, deceased, formerly Ressler, et al., from decree of O. C. Berks Co.,

1893.]            Opinion of Auditing Judge.

overruling exceptions to adjudication. Before STERRETT, C. J.,
WILLIAMS, McCOLLUM, MITCHELL and DEAN, JJ.

Audit of account of Serenus Ressler, surviving executor of
Henry Shubart, deceased.

The adjudication was as follows, by BLAND, P. J :

### FINDINGS OF FACT.

" From the evidence in the case pertaining to the claim of
Prosper Shubart, the court finds the following facts :

" 1st. Henry Shubart, the decedent, died in the year 1866,
leaving to survive him the following issue, viz : Augustus
Shubart, a son ; Prosper Shubart, a son ; Sarah Shubart, a
daughter, and Susanna Ressler and Mary Ressler, children of
a deceased daughter of the decedent, who at the time of her
decease, in 1858, was the wife of Serenus Ressler, the account-
ant here.

" 2d. Sarah Shubart, one of the children of the decedent, was
an idiot.

" 3d. In order to secure a home for his daughter Sarah, the
decedent made the following provision for her support in his
last will and testament:

" 3. I also direct that my daughter Sarah shall remain with
my son Augustus, to be maintained by him in boarding, wash-
ing, mending and clothing, for which he shall receive the fol-
lowing compensation, viz.: the interest of the lien of one
thousand dollars on the plantation and also the interest of one
thousand five hundred dollars, the lien on the mill property,
and hereby appoint my son Augustus and my son-in-law Sere-
nus Ressler and Frederick Harner, trustees of my daughter
Sarah, to see that she may be properly provided for according
to my will and make such disposition as circumstances may re-
quire ; after the death of my daughter Sarah, after all expenses
and her funeral expenses be paid—the remainder of the two
thousand five hundred dollars, the lien on the plantation and
the mill property, shall be equally divided between my sons
Augustus and Prosper and the children of my late daughter
Emeline, their heirs, executors or legal representatives.

" Frederick. Harner, one of the executors, died in 1870, and
Augustus Shubart, another one of them, died in 1880, leaving
the accountant the sole surviving executor and trustee.

"4th. That after the death of the decedent in 1866, Sarah lived with Augustus Shubart, and remained with him until about the time of his decease, in 1880, when she was taken to her home by Henrietta Brown, a daughter of Augustus Shubart, . . . . a brother of Sarah, with whom she lived until about 1882, when she was taken to the home of Prosper Shubart, her brother, the claimant here, and with whom she remained until her decease, March 11, 1892.

"5th. In 1882, when Sarah went to the home of Prosper Shubart, she was an idiot without the power of speech. She had the sense of sight and could move about the house without assistance from others. When Sarah was removed from Henrietta Brown's to Prosper Shubart's she was in the same condition, physical and mental, as she was at the time the decedent executed his will, and as she had been during the entire period from the execution of the said will to said removal to Prosper Shubart's. Sarah continued in the same physical and mental condition as she was in when she was removed to Prosper Shubart's until three and a half years before her death.

"6th. That three and a half years before her death Sarah Shubart became afflicted with paralysis and total blindness, and from that time until her death was entirely helpless. In addition to paralysis and blindness she became the subject of chronic diarrhœa. From the time of her paralysis and blindness she was utterly unable to do anything for herself. She was, during the whole intervening period up to her decease—a period of three years and a half—nursed and waited upon by Prosper Shubart and a domestic in his employ, a Miss Eisenhower. They lifted her out of her bed and placed her in a chair when she sat up; they dressed and undressed her; they conveyed her to the table; she was unable to cut her food, and they cut it; she was unable to carry her food to her mouth, and they fed her; she was unable to wash herself, and they washed her; having chronic diarrhœa, she was unable to control her stools and they were discharged in her bed, or clothing, and they removed her from her bed and changed and washed the bedding, and removed her soiled and substituted clean garments, and washed the soiled ones. Her condition was so unfortunate that she required constant attention and nursing, and the services rendered by Prosper Shubart and his servant were

of the most laborious and offensive character.   Sarah Shubart was a heavy woman, weighing from 150 to 175 pounds, and her frequent removals involved much heavy lifting.

" 7th. The surviving executor and trustee gave no care or attention to Sarah Shubart during a period of ten years before her decease.   He never saw her in that whole period; he had heard that she was blind and paralyzed, but he gave himself no concern about her; he lived a half square from her during those ten years and at the time of her death, yet never saw her during that time and did not attend her funeral or give himself any concern about her burial.   When she needed a physician Prosper Shubart employed one, and when she died, he, Prosper Shubart, buried her.   Serenus Ressler, the accountant, testified that the reason why he gave no attention to Sarah was that the relations between him and Prosper Shubart, her custodian, were unfriendly.

" 8th. Prosper Shubart received from the owners of the real estate, upon which the twenty-five hundred dollars, mentioned in the will of the decedent, was charged, one hundred and fifty dollars a year during the entire period of ten years that he had Sarah in his home, and has presented a claim for a medical bill and funeral expenses paid by him, and for nursing and personal services of himself and his employee, rendered after Sarah became paralyzed and blind and sick with chronic diarrhœa, claiming that the one hundred and fifty dollars which he received was for the objects specified in the will, i. e., boarding, washing, mending and clothing, and that, under the will of the decedent, funeral expenses, medical attendance and nursing were intended to be paid out of the principal of the twenty-five-hundred-dollar charge.

" 9th. That for the nursing, feeding, the carrying and removing from place to place of the said Sarah Shubart, and for keeping her person clean and her condition cleanly, Prosper Shubart earned five dollars a week for the period of three years and a half immediately before her death, and that he has paid for medical attendance to Sarah and the expenses of her funeral eighty-six dollars and twelve cents ($86.12).

":10th. That Prosper Shubart did not take Sarah Shubart into his house with a view to her living with him as a member of his family, and without compensation, but with the understand-

ing and expectation that he would be compensated according to the terms of the will of the decedent for what he did for her.

### CONCLUSIONS OF LAW.

"1st. That the interest of the twenty-five hundred dollars, charged by the will of the testator on his real estate during the. lifetime of Sarah, was intended by him to compensate the custodian of Sarah for her boarding, washing, mending and clothing, and for kindred services and expenditures, but was not intended to cover compensation for nursing and personal attendance upon Sarah in case she should become totally helpless, blind and otherwise seriously diseased; nor was it intended to reimburse such custodian of Sarah for medical and funeral bills paid by him.

"2d. That under the will of Henry Shubart so much of the principal of the said charge of twenty-five hundred dollars, as is needed, is applicable to the payment of reasonable expenses for the funeral, medical attendance and nursing of Sarah Shubart.

"3d. That Prosper Shubart is entitled to the sum of nine hundred and ten dollars for one hundred and eighty-two weeks' nursing, personal attendance, etc., of Sarah Shubart, at the rate of five dollars per week, and the sum of eighty-six dollars and twelve cents for medical bills and funeral expenses paid.

"The testator says ' After the death of my daughter Sarah, after all expenses and her funeral expenses be paid, the remainder of the $2,500, the lien on the plantation and mill property, shall be equally divided between my sons Augustus and Prosper and the children of my late daughter, Emeline, their heirs, executors or legal representatives.'

"By the words, ' the remainder of the $2,500, the lien on the plantation and mill property,' the testator meant what was left of the amount of the charge after something had been taken from it. What was this ' something ' that the decedent had in contemplation? It was not ' boarding, washing, mending and clothing,' for they were fully provided for out of the income, and the decedent must have intended something else. Funeral expenses were surely one object to which the principal of the charge might be applied, for he expressly designated them. The clause in the will must receive a reasonable construction; but such construction is required to be consistent with the

rules of law.  The intent of the testator, when it does not conflict with any rule or policy of law, is supreme in the interpretation of a will.

" Mr. Justice COULTER, in Hunter's Estate, 6 Pa. 106, says : ' If anything is distinctly and authoritatively settled in our law, it is that, in the construction of wills, the intent of the testator, collected from the words and language of the whole will, must be the guide and legal conclusion, and the governing principle of judgment;' and at page 107 he further says : ' A man shall be allowed to speak his mind in his will, and the learned, accurate, and searching Mr. Butler in his note on Coke, Littleton, 379, states " that no rule of law has a more ancient origin than that if a testator expresses his intention defectively in using technical and artificial terms, or by using them improperly, yet if his intentions can be collected from his will, the law, however defective his language may be, will construe his words according to his intention." '

" Mr. Justice SHARSWOOD in Provencher's Ap., 67 Pa. 466, speaking upon the same rule of construction, says : ' There are no arbitrary or unbending rules in the construction of the words of a will.  No two wills are in all respects alike.  Nevertheless the cardinal canon still holds good, that the intention of the testator of each will, separately, is to be gathered from its own four corners.  Hence almost every general rule has its recognized special exceptions, with exceptions to such exceptions which bring us back to the general rule again, and this may and sometimes has been carried even further in the vain attempt to generalize and classify all the decisions upon this most difficult and doubtful subject—the ascertainment of the intention from the words of a man who in many cases had no intention at all, the question not being present in his mind at the time the words were used.'

" In order to discover the intention of the testator, and to arrive at his true meaning in the use of words so defective as to require construction, the court will look at the circumstances under which the devisor made his will, as to the state of his property, or his family and the like : 3 Jarman on Wills, 705, Randolph & Talcott's ed., 1881.

" Going back to the execution of this will, we see so far as the provision in regard to the charge of $2,500 is concerned,

that, with respect to that fund, the first object of the testator's solicitude, care and bounty, was Sarah. He knew she was an idiot, and he intended to set aside that fund for her maintenance and welfare. As to those in remainder, they were secondary objects in his mind, and he, in terms, gave them but the residue of the fund.

" Sarah being an idiot the deceased clearly foresaw that she must be maintained in ' boarding, washing, mending and clothing,' and to secure them for her he bequeathed the income of the charge. He also clearly foresaw that in the course of nature she must die, and to meet the expenses which would ensue upon her death, he provided for the payment of her funeral expenses out of the corpus of the fund. The future was hidden from him, but he knew, as all rational men know, that idiocy is incurable, and that death is inevitable. He made provisions, in terms, to meet the condition which he knew to be beyond relief, and the event which he knew was certain to happen.

" Sarah was, in his mind, the primary object of his bounty, and can it be doubted, that if he had had foreknowledge of her subsequent afflictions; that if he could have foreseen her helplessly paralyzed, totally blind, the victim of chronic diarrhœa, absolutely dependent for food, for removal from place to place, for bodily cleanliness and comfort, for nursing, for medical attendance, indeed for life itself, upon the offices of others, that he would not have specifically provided for compensation to those who should render her such vital service ?

" He did not, in terms, provide for the payment of medical attendance, because he did not certainly know that she would need any. He did not, in terms, provide for the payment of compensation for nursing, because he did not certainly know that she would need any ; but the general intent of the testator in relation to this fund seems reasonably clear, that it was devoted by him to the wants of Sarah, and to the payment of necessary expenses ; to nursing and medical attendance, as well as the cost of the funeral.

" The law favors the first taker rather than the second taker. If that construction is not adopted in this case, then the physician who attended Sarah in her illness can claim nothing out of this fund ; and, of course, those who nursed her and attended to her every want under such disagreeable and distressing cir-

cumstances, can get nothing for their laborious services; but those who appear to have done nothing for her welfare, and who were but secondary objects of the testator's bounty, take the whole fund, to the exclusion of those who worked so faithfully on the lines of the testator's intention.   We do not think that the exclusion of the medical and nursing bill would be the carrying out of the will of the decedent.   His language is, 'after the death of my daughter Sarah, after all expenses and her funeral expenses be paid, the remainder of the $2,500, the lien on the plantation and the mill property, shall be equally divided between my sons Augustus and Prosper, and the children of my late daughter, Emeline.'

" Our courts have taken high ground in favor of carrying out the intention of the testator, and giving the full benefit of his bequests to the first as against the second taker, where power to consume the corpus has been given, and have laid hold of slight expressions in wills to effectuate the intention of the testator and benefit the primary object of his bounty as against the secondary one."

After citing and quoting from Gold's Est., 133 Pa. 495 ; Markley's Est., 132 Pa. 352; and Heppenstall's Est., 144 Pa. 259, the court continued:

" It is a maxim of law (Broom's Maxims, 453) that the meaning of a word may be ascertained by reference to the meaning of words associated with it.   The testator says ' after all expenses and her funeral expenses be paid,' etc.   The general word ' expenses ' is here to be interpreted by the words 'funeral expenses.' .   In other words it means expenses of kindred character, such as expenses incurred for medical attendance, nursing, etc.   It certainly does not mean ' boarding, washing, mending and clothing,' for they were payable out of the income ; and to hold them as meaning expenses of settlement, is to put a very narrow construction on them and to ignore the general intent of the testator, which manifestly refers to expenses incurred in relation to the person of Sarah, and ejusdem generis with funeral expenses.

· " As illustrations of the application of the principle of construction embodied in the maxim *noscitur a sociis*, the following cases are pertinent :  Pardee's Appeal, 100 Pa. 412 ; White's Appeal, 15 W. N. C. 313, and Assigned Estate of the Clymer Distilling Co., 17 W. N. 374.

" The claim of Prosper Shubart is resisted upon two grounds:

" 1st. That Sarah lived with him as a member of his family, and that the family relationship raised a presumption that the services rendered by Prosper were voluntary, and not done in expectation of payment.

" 2d. That Prosper, having received the one hundred and fifty dollars interest annually from the owners of the farm and mill, upon which the two thousand five hundred dollars were charged, the presumption of law is that he received it as full compensation for his services.

" As the first ground of objection, the court having found as a fact that Sarah was not taken by Prosper Shubart on the footing of a member of his family, and that he expected to be paid whatever the will allowed him for his services, it has nothing to stand on in the present state of the facts.

" But as between brother and sister, there is no presumption that they live together as members of a family; family relationship must be proved by the party who asserts it.

" In Curry v. Curry, 114 Pa. 371, Mr. Justice TRUNKEY said: ' The performance and receipt of services generally raises an implied promise by him who receives, to compensate him who performs, but the implication may be rebutted. When the parties are parent and child, or members of the same family, the relationship includes the implication of a promise. In all cases, except that of parent and child, there must be evidence beyond the relationship that the creation of no debt was intended. Where the parties are brother and sister, the sister claiming compensation for her services, the burden of showing family relationship, or other cause, to exclude the implication of his promise to pay for the services, is upon the brother. Because of the fact that they are brother and sister, less evidence, besides, would be required to establish that they lived together as a family than if they were strangers. If he shows that they so lived, the jury ought not to find an implied promise.' To the same effect are Smith v. Milligan, 43 Pa. 108, and Mayfaith's Appeal, 2 Atl. R. 28.

" But what evidence is there here to rebut the presumption of law that payment was intended? None. It is all the other way. The claimant took an idiot sister, for whose maintenance provision had been made by her father's will. Those from

whom he received her had been paid for keeping her, and he received during a period of ten years one hundred and fifty dollars a year. Certainly such facts only serve to fortify and not to destroy the legal presumption of a contract to pay."

After reviewing the cases of Ann Pierce's Appeal, 1 Chester Co. R. 93; Rorer's Estate, 5 Pa. C. C. R. 73; Neel's Adm'r v. Neel, 59 Pa. 347; Neal's Adm'r v. Gilmore, 79 Pa. 428; Bishop's Est., 2 W. N. 557; Hartman's Ap., 3 Grant, Pa. 271; Gifford v. Halfman, 3 Phila. 127; Ranck v. Albright, 36 Pa. 367; Carr v. Chartiers Coal Co., 25 Pa. 337, and Larkin's Ap., 16 W. N. 544, the court continued:

" The Larkin's case bears no resemblance to this one. The claimant here made no settlements. He had no opportunity given him to present his claim for nursing, feeding and caring for the bodily wants of Sarah Shubart. He never saw her trustee in the whole period of ten years during which he had her, about anything concerning her, and, so far as the evidence in this case goes, it does not appear that the trustee knew that Prosper was receiving even the interest on the charge.

" The interest of the trustee in this case was not aroused until a claim was made which, if allowed, would affect the amount of money which his children would receive from the charge. Certainly this claimant has done nothing to estop him from making this claim, if the claim is otherwise good.

" Gifford v. Halfman was a suit against a son for nursing his father. The claimant in that case had an express contract with the son, and had been paid in full according to the contract. Judge HARE, in refusing to take off a nonsuit, said: 'The court are clearly of opinion that there was no evidence for the jury, and that the case was properly withdrawn from their consideration. Without a contract the plaintiff could have recovered nothing, and under the contract the evidence was conclusive that she had been paid in full.' In that case the measure of the son's liability to the claimant was to be found in the contract he had made with her, and nowhere else; there was no footing for an implied contract.

" In this case the question is whether Prosper Shubart is entitled, under the will of this decedent, to be paid for anything but ' boarding, washing, mending and clothing;' for that he rendered services to her of a radically different character and of great value, cannot be disputed.

" The remaining two cases cited by the learned counsel in support of their second objection to the claim seem to the court to favor the theory of the claimant.   They are the cases of Ranck v. Albright and Carr v. Chartiers Coal Co.   The principle of both cases is stated in Ranck v. Albright, 36 Pa. 367, i. e., that service demanded and performed, not anticipated at the time of hiring, is no basis for a legal implication of a promise to pay more than the contract stipulated, if the nature of the service be not different from that which the parties had in view when the hiring took place, and if the hiring was for a definite period of time.

" Tested by the standard of those cases, how does this one stand ?   When Sarah was taken to Prosper Shubart's she was a mute idiot, with power of locomotion and of feeding herself. So far as the evidence throws any light upon her bodily condition when she was taken to Prosper's, she required no special care or attention.   She seems to have been nothing but a harmless idiot, able to help herself to all she needed to supply her bodily wants.   Six and a half years after she came to him she was suddenly stricken with paralysis, involving a total loss of the use of her arms and legs ; she became totally blind ; she could not move herself from one place to another, but had to be carried ; she could not feed herself ; her paralysis and blindness were followed with chronic diarrhœa ; she was unable to control the movements of her bowels, and habitually and frequently discharged their contents into her bed, where she laid powerless to move.   Was her condition not radically changed and were not the duties and labors of those who had her in charge different in nature from those which the parties had in view when Sarah went to live with Prosper?   Surely so, and it is only by an utter distortion of ideas that 'boarding, washing, mending and clothing' can be held to embrace the kind and nature of personal services rendered by Prosper Shubart to Sarah during the last three and a half years of her life.

" For the foregoing reasons the court distributes to Prosper Shubart the sum of nine hundred and ninety-six dollars and twelve cents, in compliance with the third conclusion of law."

The amount allowed was afterwards reduced to three dollars per week.

Exceptions to the adjudication were overruled.

*Errors assigned* were in overruling exceptions, quoting them.

*Josiah Funck, Henry C. G. Reber* with him, for appellant, cited: Gifford v. Halfman, 3 Phila. 127; Rorer's Est., 5 Pa. C. C. R. 73; Ulrich v. Arnold, 120 Pa. 170; Houck v. Houck, 99 Pa. 552; Ranck v. Albright, 36 Pa. 367; Carr v. Chartiers, Coal Co., 25 Pa. 337; Jones v. Woods, 76 Pa. 408; Mayer v. Rhoades, 135 Pa. 601.

*J. H. Jacobs* and *H. P. Keiser,* for appellee, cited: Curry v. Curry, 114 Pa. 371; Smith v. Mulligan, 43 Pa. 108; Mayfaith's Ap., 2 Atl. R. 28; Gold's Est., 133 Pa. 496; Heppenstall's Est., 144 Pa. 259; Carr v. Chartiers Coal Co., 25 Pa. 337.

PER CURIAM, March 13, 1893:

The correctness of the decree in this case is so fully vindicated in the clear and exhaustive opinion of the learned president of the orphans' court that little if anything can be profitably added thereto. His findings of fact are very full, and methodically presented, and an examination of the record has satisfied us that the legal questions arising thereon have been justly and equitably determined. There appears to be nothing in either of the specifications of error that calls for extended comment, or that would justify either a reversal or modification of the decree.

The testator's invalid daughter, Sarah, appears to have been the object of his special solicitude. He accordingly provided, for her benefit, a secured fund of twenty-five hundred dollars, the interest of which, at six per cent, appears to have been intended as compensation for her "boarding, washing, mending and clothing." While this was a small amount for that purpose, the testator doubtless regarded it as sufficient while enjoyment of her ordinary health continued. He further provided: "After the death of my daughter Sarah, after all expenses and her funeral expenses be paid, the remainder of the two thousand five hundred dollars . . . . shall be equally divided," etc. This evidently contemplates that extraordinary expenses, incident to Sarah's last illness, and her funeral expenses shall be paid out of the corpus of the fund. It is only what may remain, "after all expenses and her funeral expenses be paid,"

that he directs to "be equally divided," etc. It so happened that Sarah's last illness was long continued, and her utterly helpless condition, during that time, was such as to necessitate extraordinary services and attention. The amount allowed for those services is undoubtedly very reasonable, and the appellants have no just reason to complain.

The decree is affirmed on the opinion of the learned president of the orphans' court, and the appeal is dismissed with costs to be paid by appellants.